# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-56

**STATE OF LOUISIANA**

**VERSUS**

**TIMOTHY H. QUEEN**

**A/K/A TIMOTHY HUGH QUEEN**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 6736-09
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Wilbur J. Stiles, Judges.

**AFFIRMED.**

**Hon. Stephen C. Dwight**
**Fourteenth Judicial District Attorney**
**David S. Pipes**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Douglas Lee Harville**
**Louisiana Appellate Project**
**P. O. Box 52988**
**Shreveport, LA 71135**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Timothy H. Queen**

**Timothy Hugh Queen**
**MPEY-Spruce-2**
**Louisiana State Prison**
**Angola, LA 70712**
**PRO SE:**
    **Timothy H. Queen**

**GREMILLION, Judge.**

In November 2008, Defendant went into a pharmacy in Lake Charles, Louisiana, armed with a firearm, and demanded the pharmacist give him certain pills. He was apprehended shortly after the robbery and identified by the victims. Defendant was convicted of armed robbery in violation of La.R.S. 14:64, and armed robbery with a firearm, in violation of La.R.S. 14:64.3.

Defendant seeks review of the trial court's denial of his second motion pursuant to *State v. Peart*, 621 So.2d 780 (La.1993), following a remand by this court ordering an evidentiary hearing.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

On January 15, 2009, Defendant, was charged by grand jury indictment with one count of armed robbery, a violation of La.R.S. 14:64, one count of armed robbery with a firearm, a violation of La.R.S. 14:64.3, one count of possession of a weapon by a convicted felon, a violation of La.R.S. 14:95.1, and one count of possession of a firearm in a firearm free zone, a violation of La.R.S. 14:95.2. On August 20, 2009, the trial court granted Defendant's request to represent himself, in part, and appointed co-counsel. On September 22, 2009, the State severed the charges of possession of a weapon by a convicted felon and possession of a firearm in a firearm-free zone.

At the September 22, 2009 hearing, Defendant withdrew his plea of not guilty and tendered a plea of not guilty and not guilty by reason of insanity. On November 4, 2009, the trial court appointed a sanity commission to determine

---

[1] The supreme court in *Peart*, 621 So.2d at 787, stated: "If the judge has an adequate record before him and a defendant has claimed that he is receiving ineffective assistance of counsel before trial, the judge may rule on the ineffective assistance of counsel claim at that time."

Defendant's competency to proceed and stayed all proceedings. On April 14, 2010, the trial court found Defendant competent to proceed.

On October 3, 2014, Defendant filed his first *Peart* motion, and a hearing was conducted on October 28, 2015. The trial court denied Defendant's motion, and Defendant sought review in this court. This court issued the following ruling:

> **WRIT DENIED:** Defendant filed a pro se writ application with this court seeking supervisory review of the trial court's October 28, 2015, denial of Defendant's pro se motions to substitute counsel and for relief pursuant to *State v. Peart*, 621 So.2d 780 (La.1993). Defendant's claims concerning his motion to substitute counsel are without merit.
>
> Defendant contests the trial court's denial of the *Peart* motion challenging the general caseload standards and practices of the Louisiana Public Defender Board. However, Defendant's case involves hybrid representation wherein the assisting attorney was a private lawyer contracted through the Louisiana Public Defender Board as conflict counsel. As the claims raised in Defendant's *Peart* motion were not germane to the reality of Defendant's representation situation, Defendant was not entitled to relief under *Peart*. Therefore, Defendant is not entitled to relief on his claims concerning the trial court's handling of and ruling on Defendant's *Peart* motion.
>
> Accordingly, Defendant's writ application is denied.

*State v. Queen*, 15-1163 (La.App. 3 Cir. 2/23/16) (unpublished opinion).

On June 17, 2016, Defendant filed a pro se "Motion for Court to Rescind its Order of August 20, 2009 Granting Hybrid Representation." Defendant told the trial court that he wanted Mr. Robert Shelton to "straight up represent" him, so that he could refile his *Peart* motion. Initially denying Defendant's request, the trial court reconsidered and granted the request on October 17, 2016, the day before trial. Before the start of trial the following day, October 18, 2016, the State notified the trial court that Defendant filed a second *Peart* motion pro se. The State objected to the motion, asserting that it was nothing more than a delay tactic.

2

Mr. Shelton had no objection to the motion being denied, so the trial court denied the motion without a hearing.

After a trial held October 18-19, 2016, a unanimous jury found Defendant guilty as charged of armed robbery and armed robbery with a firearm. On December 14, 2016, the trial court sentenced Defendant on the armed robbery conviction to seventy-five years in the custody of the Department of Public Safety and Corrections to be served without benefit of probation, parole, or suspension of sentence and on the armed robbery with a firearm conviction to five years to be served without benefit of probation, parole, or suspension of sentence. The trial court ordered the armed robbery with a firearm sentence to run consecutively to the sentence imposed for armed robbery.

On appeal, this court conditionally affirmed Defendant's convictions and sentences but found Defendant was prevented from presenting the evidence necessary to evaluate his second *Peart* motion. *State v. Queen*, 17-599 (La.App. 3 Cir. 1/4/18), 237 So.3d 547, *writ denied*, 18-211 (La. 11/20/18), 257 So.3d 186. This court issued the following decree:

> Defendant's convictions and sentences are conditionally affirmed. The case is remanded to the trial court to conduct an evidentiary hearing on the question of whether Defendant's counsel was ineffective based on an excessive caseload and/or inadequate resources. If the evidence shows Defendant's counsel was ineffective, the trial court must set aside Defendant's convictions and sentences. Defendant should be appointed reasonably effective counsel to represent him in further proceedings. Defendant may appeal from any adverse ruling on this issue, and in the absence of such appeal, this court affirms the Defendant's convictions and sentences. In the event Defendant's convictions and sentences are affirmed, the trial court is directed to inform the Defendant of the correct prescriptive period of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the Defendant within ten days of the trial court's ruling on the evidentiary hearing and to file written proof that the Defendant received the notice in the record of the proceedings.

3

*Id.* at 584.

After the hearing on September 1 and 2, 2022, the trial court accepted post-hearing briefs and issued a ruling on June 2, 2023, denying Defendant's second *Peart* claim.  On June 21, 2023, Defendant filed a motion for appeal on the *Peart* ruling, which was granted the following day.  Defendant's counsel alleges two assignments of error and Defendant, pro se, alleges two assignments of error.  For the following reasons, we find no error in the trial court's denial of Defendant's second *Peart* motion.

## ASSIGNMENTS OF ERROR

1. Assuming the Trial Court properly limited its *Peart* analysis of Mr. Shelton's representation of Mr. Queen to the day before trial began and the day trial began, Mr. Shelton did not possess adequate knowledge, time, and/or resources to apply his skill and knowledge to the task of defending Mr. Queen.

2. The Trial Court patently erred when it limited its *Peart* analysis of Mr. Shelton's representation of Mr. Queen to the day before trial began and the day trial began. However, under any period of review, Mr. Shelton did not possess adequate knowledge, time, and/or resources to apply his skill and knowledge to the task of defending Mr. Queen.

## PRO SE ASSIGNMENTS OF ERROR

1. The trial court erred when it sustained the state's objection made during appellant's *Peart* hearing that portions of the testimonies of King Alexander, Eugene Bouquet, Michael McHale, and Mitchell Bergeron consisting of their caseloads/workloads and resources were irrelevant, relegating such testimonies to be taken as proffers, and it further erred when it denied appellant's post-hearing motion to reconsider its ruling.

2. The trial court erred when it denied appellant's post-hearing motion to supplement the record with an investigator's report establishing a defense of involuntary intoxication, ruling that whether or not to present such a defense constitutes trial strategy and therefore is not a consideration under *Peart*, and that to consider the same would improperly expand the remand directive of the court of appeal.

## ASSIGNMENTS OF ERROR ONE AND TWO

### *Peart Analysis*

In assignments of error one and two, Defendant argues Mr. Shelton did not possess the required knowledge, skill, or time to adequately represent Defendant whether considering a one-day period or the entire period of Mr. Shelton's representation.

"Unless contrary to law, rulings of the trial court in pretrial matters are generally shown great deference absent a clear showing of an abuse of discretion." *State v. Divers*, 34,748, p.13 (La.App. 2 Cir. 6/22/01), 793 So.2d 308, 316; *See also State v. Stucke*, 419 So.2d 939 (La.1982).

In this court's opinion remanding for an evidentiary hearing on Defendant's *Peart* claim, we noted that "the type of evidence needed to evaluate a *Peart* claim is very fact-specific, detailed, and usually comes from the counsel himself[.]" *State v. Queen*, 237 So.3d at 580.

In *State v. Reeves*, 06-2419 (La. 5/5/09), 11 So.3d 1031, 1074-77, *cert. denied*, 558 U.S. 1031, 130 S.Ct. 637 (2009), (first and second alterations in original) (footnotes omitted), the supreme court stated:

> This court has previously held that "[a] claim of ineffectiveness is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal." *State v. Miller,* 1999–0192 p. 25 (La.9/6/00), 776 So.2d 396, 411, *cert. denied,* 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001). While it is generally true that ineffectiveness claims are considered on post-conviction, *Peart* held that a claim of ineffectiveness may be raised pretrial, based on counsel's ability to provide constitutionally effective counsel due to resources available and caseload concerns. In this case, the *Peart* motions raised pretrial dealt with the pretrial circumstances alleged, and the district court made its ruling based on those circumstances. Therefore, our analysis will evaluate the district court's pretrial ruling only. Although defense counsel on appeal has raised allegations of ineffective assistance of counsel occurring at trial, those matters are relegated to post-conviction, where an evidentiary hearing may be

conducted, if necessary, to determine the merits of the defendant's allegations.

In evaluating Ware's ineffective assistance claim, the district court was required to undertake a detailed examination of the specific facts and circumstances of the case. This detailed examination is necessary because there is no precise definition of reasonably effective assistance of counsel, which cannot be defined in a vacuum. Thus, of necessity, each ineffective assistance claim demands an individual, fact-specific inquiry. *See Peart,* 621 So.2d at 788. As stated in *Peart,*

> . . . the true inquiry [for the district court] is whether an *individual* defendant has been provided with reasonably effective assistance, and no general finding by the trial court regarding a given lawyer's handling of other cases, or workload generally, can answer that very specific question as to an individual defendant and the defense being furnished him. *Id*., 621 So.2d at 788 (emphasis in original).

In reviewing a district court's decision on a claim of ineffective assistance, "we take reasonably effective assistance of counsel to mean that the lawyer not only possesses adequate skill and knowledge, but also that he has the time and resources to apply his skill and knowledge to the task of defending each of his individual clients." *Peart,* 621 So.2d at 789.

. . . .

After reviewing the record and argument of counsel, we find that Ware did not provide sufficient evidence to show that his caseload was so burdensome, and the resources available to him were so limited, as to result in the delivery of constitutionally ineffective assistance of counsel. The record shows that Ware admitted that the defense's own expert indicated that Ware's caseload would not violate ABA guidelines. Nor would Ware's caseload exceed the standards enunciated in the ethics opinion on which the defense relied. On cross-examination, Ware admitted that he makes the decision as to those cases with which he will be involved. Moreover, Ware also admitted that one of the other capital cases with which he was involved had six attorneys working on the defense.

The state pointed out mistakes in the listing of Ware's caseload, including cases not going to trial when Ware had them listed, cases listed as priority cases which were not priorities, cases listed as ready for trial which were not in a posture to be tried, cases in which the defendant was not competent so could not be tried, and cases where the defendants were charged with crimes less serious than those

6

indicated on Ware's list. The state further showed that one of the staff attorneys, whom Ware indicated needed his assistance in defending cases, had been practicing law for ten years. Finally, the state revealed that Judge Canaday offered to appoint different counsel to relieve Ware's caseload burden in three other specific cases, but Ware declined.

By Ware's own admission, he could select those cases, other than capital cases, for which he would represent the indigent defendants or for which he would render assistance to staff attorneys within his office. Ware did not have a specific division of court for which he was responsible. Ware's caseload did not exceed ABA guidelines or the guidelines expressed in the ethics opinion proffered in evidence in support of his contention. Ware was assisted by two other attorneys in this matter. He was provided with transcripts of the first trial, attorney notes on evidence and strategy by Reeves' counsel in the first trial, and access to those attorneys should questions arise. Reeves was provided with funding for each expert witness for which the defense requested financial assistance, including scientific witnesses and a jury consultant.

By contrast, the evidence submitted in *Peart* was much more detailed and showed, beyond doubt, the burdensome nature of the attorney's caseload and the complete lack of resources available to him in his attempt to represent his indigent clients. The public defender in *Peart,* Rick Teissier, presented evidence that, at the time of his appointment, he was personally handling 70 active felony cases. His clients were routinely incarcerated 30 to 70 days before he was able to meet with them. In a seven month period, Teissier represented 418 defendants. Of these, he entered 130 guilty pleas at arraignment. Teissier had at least one serious case, defined as an offense necessarily punishable by a jail term which may not be suspended (including first degree murder, second degree murder, aggravated rape, aggravated kidnapping, armed robbery and possession of heroin), set for trial for every trial date during that seven month period. Teissier's public defender's office only had enough funds to hire three investigators to assist in the investigation of 7000 cases annually in ten sections of court. Teissier presented evidence that in a routine case, he received no investigative support at all. The public defender's office had no funds for expert witnesses; its library was inadequate. *Peart,* 621 So.2d at 784.

We find the circumstances which were confronting Ware are easily distinguishable from the circumstances with which attorney Teissier had to contend as public defender in *Peart.* Moreover, our own review of the record shows that Reeves' counsel acted professionally and knowledgeably throughout the pretrial proceedings. Counsel's representation, especially when challenging the scientific evidence presented by the state, showed tremendous

preparation and skill. We find no error in the district court's ruling which held that Ware failed to provide sufficient evidence to show that his caseload was so burdensome, and the resources available to him were so limited, as to result in the delivery of constitutionally ineffective assistance of counsel. *See also State v. Lee,* 2005–2098 p. 42–43 (La.1/16/08), 976 So.2d 109, 138, *cert. denied,* [555] U.S. [824], 129 S.Ct. 143, 172 L.Ed.2d 39 (2008).

In sum, a *Peart* challenge pertains to a pre-trial inquiry whether Defendant's counsel is so overworked and under-resourced that he is not prepared to provide an adequate defense. This claim is usually brought by the attorney rather than a Defendant. Additionally, we note that the hearing on the *Peart* motion occurred nearly six years after the trial, conviction, and sentencing of Defendant. Nevertheless, in our previous ruling we conditionally affirmed Defendant's sentence pending the outcome of the hearing on remand.

While the defense presented testimony opining that Mr. Shelton's representation at the trial and sentencing hearings was deficient, that time period is not relevant in a *Peart* analysis and is relegated to a *Strickland* review. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). The trial court noted such:

> As he had not been to trial at the time he filed the motion, the only allegations made in that motion, and the only allegations that can be considered by the Court in reviewing the circumstances surrounding that motion, are claims of pre-trial ineffective assistance of counsel, specifically as they relate to Mr. Shelton's representation.

Thus, any claims of ineffective assistance of counsel at trial and post-trial will not be considered. Our inquiry is focused on whether Mr. Shelton's caseload was so burdensome and his resources so limited as to render him ineffective in representing Defendant.

Another unusual aspect of this case is the time period with which this inquiry will be focused. *Peart* held that the only time period this analysis applies

to is one in which counsel provides *sole representation* to the defendant. In this case, Mr. Shelton had a hybrid relationship with Defendant until the day before the trial when the trial court granted Defendant's motion to allow Mr. Shelton to be his sole representative. The trial court noted:

> As the Third Circuit indicated in its opinion on Mr. Queen's appeal, *Peart* is not applicable to situations of hybrid representation. Mr. Queen was only ever fully represented by counsel with no co-counsel situation in place during the pre-trial phase of the case from October 17, 2016 until the day the trial began, October 18, 2016. The Court believes that this period of October 17, 2016 through October 18, 2016 is the only relevant time period that should be considered in ruling on the instant motion.

Thus, as a technical matter under *Peart,* the only period of time to be examined was a 24-hour window before the trial started. As a practical matter, an examination of this limited time period simply would not provide sufficient facts relating to the historical relationship and representation of counsel which *Peart* requires. Mr. Shelton was hybrid counsel for Defendant from 2013 through 2016, and as noted by Mr. Mitchell Bergeron at trial, hybrid representation does not relieve an attorney of any of his duties to his client. The trial court chose to focus on the period of January 1, 2016 through December 2016 in determining if Mr. Shelton's caseload was too burdensome; additionally, it considered other relevant facts pertaining to Mr. Shelton's representation in reaching its findings.

The trial court found that on January 1, 2016, Mr. Shelton's caseload totaled 34 cases—21 open felonies, 2 auto-dormant felonies, 7 open low-level felonies, 1 auto-dormant low-level felony, and 2 open misdemeanors. The trial court found that on December 1, 2016 (a little more than a month after Defendant's trial), Mr. Shelton's caseload totaled 40 cases—1 fugitive capital case, 3 auto-dormant felonies, 26 open felonies, 1 auto-dormant low-level felony, 6 open low-level

felonies, 1 auto-dormant misdemeanor, and 2 open misdemeanors. The trial court also found that Mr. Shelton represented a total of 27 civil cases in 2013, 2014, 2015, and 2016. The trial court concluded:

> Combining that number, although it encompasses more than just the relevant dates of October 17-18, 2016, with the numbers from January 1, 2016 and December 1, 2016 of Mr. Shelton's criminal cases (which, again, is over-inclusive because the numbers are not limited to only October 17-18, 2016), the Court does not find that Mr. Shelton had a grossly excessive caseload by the standards argued by Mr. Queen. Even if the Court looked at the numbers from 2013 through 2015, the numbers still do not exceed Mr. Queen's argued standards.

According to the trial court, the standard set forth in Defendant's second *Peart* motion recommended a public defender not exceed the following number of cases per year—150 felonies, 400 misdemeanors, 200 juvenile, 200 mental health, and 25 appeals.

The trial court also referred to the extensive amount of work (2000 pages of material) represented in Mr. Shelton's file on Defendant's case, noting that Mr. Shelton was presumably in possession of the file during the relevant time period. Also included in the file was much correspondence between Mr. Shelton and Defendant, including the period of hybrid representation. Of special note, the trial court asserted, was the fact that Mr. Shelton did not request a continuance on October 17, 2016.

The trial court concluded its ruling as follows:

> Considering all of that, the Court finds that Mr. Shelton was not overburdened by an excessive caseload and inadequate resources at the time he represented Mr. Queen from October 17, 2016 until October 18, 2016. As such, without his counsel being overburdened by an excessive caseload and inadequate resources at the time he was representing Mr. Queen, there is no relief under *Peart* that can be afforded to Mr. Queen.

*Testimony and evidence at the Peart hearing*

We note at the outset that Mr. Shelton unfortunately died in June 2017 and could not testify himself regarding his caseload and the resources available to him.

**Edward King Alexander, Jr.**

Edward King Alexander, Jr., chief of the appellate section of the Calcasieu Public Defender's Office, testified that he had worked continuously with the PDO since 2006 and had represented Defendant at some point. When defense counsel stated that he wanted to talk with Mr. Alexander about the resources of the PDO during his representation of Defendant, the State objected. After hearing argument, the trial court sustained the State's objection and allowed Defendant to proffer the contested evidence. The proffered testimonies will be discussed in Defendant's pro se assignment of error number one.

Resuming his questioning of Mr. Alexander, defense counsel asked Mr. Alexander why he withdrew from Defendant's case. Mr. Alexander explained that the PDO was served with a civil petition in which Defendant alleged the Calcasieu PDO had excessive caseloads. At that point, Mr. Alexander testified, a "conflict contractor attorney was assigned Defendant's case." Mr. Alexander believed Eugene Bouquet succeeded him as Defendant's attorney.

**Eugene Bouquet**

Eugene Bouquet, a conflict attorney for the Calcasieu PDO, testified that he represented Defendant from approximately August of 2010 to April of 2012. To his understanding, the PDO could not continue to represent Defendant because it had been sued by Defendant. The lawsuit, Mr. Bouquet testified, alleged that the Calcasieu PDO could not provide adequate representation due to its excessive

11

caseloads. When Defendant told Mr. Bouquet about the civil suit against the PDO, Mr. Bouquet told Defendant that he also had a heavy caseload. Eventually, Mr. Bouquet was relieved of his representation because Defendant's case was moved to a section of the court in which Mr. Bouquet did not work. Mr. Bouquet testified that it was his understanding that changes were made to address the workload of the conflict attorneys. According to Mr. Bouquet, Donald Sauviac began representing Defendant.

### Robert Michael McHale, Jr.

Robert Michael McHale, Jr., a public defender for Cameron Parish, testified that he remembered representing Defendant at some point for about a year. Most of the cases Mr. McHale handled pursuant to his PDO contract were life without parole (LWOP) cases. Defendant's case, Mr. McHale testified, "came with the package" of cases he inherited from Mr. Sauviac. When asked if he remembered approximately how many PDO cases he had at that time, the State lodged an objection as to relevancy. The trial court sustained the State's objection and stated that the testimony could be introduced as part of defense counsel's proffer. On cross-examination, Mr. McHale agreed that when he represented Defendant, Defendant filed and argued his own motions.

### Mitchell Bergeron

Mitchell Bergeron, the Deputy District Defender for the Calcasieu PDO, testified that Mr. Shelton was assigned to Defendant's case on October 2, 2013. Mr. Bergeron identified a document labeled Defendant's Exhibit 7 as a printout showing the number of PDO cases assigned to Mr. Shelton between 2013 and 2016. Another document, Defendant's Exhibit 7-2, showed the cases closed under Mr. Shelton's name between October 2, 2013, and June of 2017, the date Mr.

Shelton's contract ended. The purpose of the two printouts, Mr. Bergeron testified, was to compare names in order to make sure no names were left out. Defendant's Exhibit 7-3, Mr. Bergeron testified, was another closed-file list.

According to Mr. Bergeron, Defendant's Exhibits 7-1, 7-2, and 7-3 were used to produce Defendant's Exhibit 7-4. Defendant's Exhibit 7-4 is titled "Robert Shelton's Caseload 10/2/13 – 12/31/16." Exhibit 7-4 shows when each case was assigned to Mr. Shelton and when each case was closed.

Mr. Bergeron identified Defendant's Exhibit 8 as a memo he prepared regarding the termination of Mr. Shelton's contract with the PDO. According to the memo, Mr. Shelton's position ended on June 30, 2017, when he had an incapacitating stroke. Mr. Bergeron said a meeting was planned for June 29, 2017, to discuss Mr. Shelton's termination "due to some issues that we had determined in multiple files[.]" Mr. Shelton missed the meeting, Mr. Bergeron testified, and then had the stroke. When asked if the PDO intended to terminate Mr. Shelton as a result of his failure to tend to clients, Mr. Bergeron responded, "Correct." Finally, Mr. Bergeron noted that Defendant's Exhibit 8 incorrectly states that Mr. Shelton failed to file an appeal in Defendant's case.

When asked if he had any supervisory role over Mr. Shelton, Mr. Bergeron replied, "No[,]" and explained that Mr. Shelton was an independent contractor who used his own skill and judgment to represent his clients. Addressing Defendant's Exhibit 9, Mr. Bergeron stated that it included documentation of complaints to the PDO regarding Mr. Shelton's representation. The "complaints" consist of six messages related to Defendant and his various requests and messages relating to five other Defendants mainly relating to lack of jail visits.

The next exhibit discussed by Mr. Bergeron was Defendant's Exhibit 7-7, "summarized case reports" from the PDO's system that showed the totals of different types of cases Mr. Shelton had on behalf of the PDO. According to the "snapshot" dated January 1, 2013, Mr. Shelton had 155 cases; January 1, 2014, Mr. Shelton had 160 total cases; January 1, 2015, Mr. Shelton had 53 cases; January 1, 2016, Mr. Shelton had 34 cases; and by December 01, 2016, Mr. Shelton had 40 cases.

Each "snapshot" indicated the number of files in "auto-dormant" status, fugitive status, and open status. Mr. Bergeron explained that if no activity was input into a file for approximately 180 days, "the system [would] generate an auto-dormant status" on the file. "Fugitive status," Mr. Bergeron explained, suggested that a person was "in some sort of bench warrant status." A file with "fugitive status" was still considered an open file, according to Mr. Bergeron. Mr. Bergeron explained that each "snapshot" separated the cases into four categories—CC, F (felony), FL (felony life), and M (misdemeanor). Although not positive, Mr. Bergeron suggested "CC" stood for "capital case." Since Mr. Shelton was not assigned capital cases, Mr. Bergeron opined that any case in the "CC" category was an oversight, possibly being a first degree murder case for which the State elected not to seek the death penalty (Mr. Shelton was noted as having 1 "CC" case for every year). Finally, Mr. Bergeron testified that Mr. Shelton received $4,166.66 per month for his contract work for the PDO.

On cross-examination, Mr. Bergeron agreed that some work had already been done on Defendant's case before Mr. Shelton became involved. The State asked Mr. Bergeron questions about Defendant's Exhibit 8, the memo regarding the reasons for Mr. Shelton's termination. After being questioned about some of

14

the failures attributed to Mr. Shelton in Defendant's Exhibit 8, Mr. Bergeron agreed that he relied on information in the clerk's system, which could have resulted in inaccurate information.

As for the "snapshots" set forth in Defendant's Exhibit 7-7, Mr. Bergeron attributed the "marked drop" in Mr. Shelton's cases between 2014 and 2015 to a change in his contract.

The next exhibit discussed on cross-examination was Defendant's Exhibit 7-4, the document showing Mr. Shelton's caseload from October 2, 2013, to December 31, 2016. The State asked Mr. Bergeron how many of the cases listed in Defendant's Exhibit 7-4 were open on October 17, 2016, when Mr. Shelton became sole counsel for Defendant. Mr. Bergeron agreed that a number of cases listed in Exhibit 7-4 were closed by early 2016. After discussing each of the cases listed in Exhibit 7-4, the following colloquy took place between the State and Mr. Bergeron:

> Q.    . . . . So, that's one, two, three, four, five, six, seven - - seven cases awaiting trial. Is it fair to say that by the time that Mr. Shelton was named as full counsel, sole counsel for Mr. Queen, he had far fewer cases on his docket then, I guess, any of the other attorneys who never had his case?
>
> A.    As far as numerically, yes.
>
> Q.    Well, is there another way to have fewer cases than numerically?
>
> A.    Well, I mean you can look at it numerically, but like, again, on LWOP it's not like a low felony case. If you've got a possession of CDS 1 or 2, that's one thing. If you've got an LWOP, that's a much more time-consuming serious case. So, I mean without comparing them side by side, yeah, looking at it numerically, yeah, it looks nice anyway.
>
> Q.    And, of these cases, like I said, I believe, there were about six that were LWOP awaiting trial, or, actually, five, and one was awaiting sentencing?

A.     I don't know.  Whatever my client thing says.

On re-direct examination, defense counsel asked Mr. Bergeron if he thought it made a difference whether Mr. Shelton was Defendant's hybrid counsel or sole counsel.  Mr. Bergeron was asked if it is easier to represent a Defendant who files and argues his own motions, and he said that it was "more entertaining sometimes" but not easier, and the same standards of professional conduct apply to whether an attorney is sole counsel or hybrid counsel.

### Stephen Hanlon

Stephen Hanlon testified that he had been practicing law since 1966 and had been representing public defenders with excessive caseloads since 2013.   Mr. Hanlon asserted that he was the General Counsel of the National Association for Public Defense, an organization that currently represented 30,000 public defenders in the United States.  Mr. Hanlon was accepted as an expert in the "appropriate ethical principles, legal standards to be applied in cases evaluating lawyer workloads and attorney performance."

In preparation for his testimony, Mr. Hanlon read Defendant's trial transcript, this court's appellate opinion, Mr. Shelton's file, and information on Mr. Shelton's "workload data."   Mr. Hanlon also spoke to Mr. Bergeron and Ms. Blouin (an attorney who later testified as an expert) about Mr. Shelton's file and read pertinent jurisprudence.  When asked if he had formed a professional opinion about whether at the beginning of Defendant's trial there was a likelihood that Defendant would not receive reasonably effective assistance of counsel, Mr. Hanlon responded:

> So, I have concluded that there was a significant risk that Mr. Queen would not receive reasonable effective assistance of counsel pursuant to prevailing professional norms because of his lawyer's

16

excessive caseload and inadequate resources. And, as a result of that, Mr. Queen's lawyer, in my professional opinion, was unable to and, in fact, did not adequately prepare Mr. Queen's case for trial.

Mr. Hanlon based his opinion on the following:

Mr. Shelton had flat-fee contracts for roughly $50,000 a year during the period that he represented Mr. Queen roughly October 2013 to December 14, 2016. And, these flat-fee contracts required him to represent an undesignated and unagreed upon number of conflict cases that the Calcasieu Public Defender had. And, whether that was 20 cases or 200 cases, and importantly the concentration of those cases was agreed to be life without parole and serious felonies. So, he had a very serious caseload.

Looking at Defendant's Exhibits 7-4 and 7-6 (a spreadsheet created by Ms. Blouin to show dominant charge and case type), Mr. Hanlon described Mr. Shelton's caseload as "grossly excessive" based on the American Bar Association Defense Function Standards.

In his testimony, Mr. Hanlon referred extensively to a report called "The Louisiana Project – A Study of the Louisiana Public Defender System and Attorney Workload Standards" (Report). The study was published in February 2017, by Postlethwaite & Netterville, APAC. Mr. Hanlon testified that according to the Report, a "high felony" took an average of 70 hours to work, and a LWOP case took roughly 200 hours to work. Considering the number of hours an attorney works in a year, Mr. Hanlon and the Report attributed 2,080 hours of work on cases (52 weeks at 40 hours per week). Mr. Hanlon explained that this number did not include the hours needed to complete CLE or administrative tasks. When asked to translate that number into the number of LWOP cases and "high felonies" a lawyer should work per year, Mr. Hanlon replied, "[A]ssuming that's all they were doing . . . it's 10 LWOPs, and it's about 30 high felonies."

17

Looking at Defendant's Exhibit 7-6, the spreadsheet showing the breakdown of the case types assigned to Mr. Shelton, Mr. Hanlon testified that the total number of hours work needed for Mr. Shelton's caseload over the relevant three-year period was 7,791 hours.[2] The following colloquy then took place:

> Q.    And, so taking the 7,791.86 hours divided by the three years, what was the workload number that should be in 7-6?
>
> A.    When you divide it by the three years?
>
> Q.    Yes.
>
> A.    Yeah.  That mathematics is 2,597 hours.

Mr. Hanlon described that amount of work as "brutal."

When asked if there was an analytical framework for deciding the amount of time needed to provide effective assistance of counsel, Mr. Hanlon replied:

> Yes, there is.  It's what we do in our work.  So, we start with *Strickland's* holding that Mr. Queen was entitled to reasonably effective assistance pursuant to prevailing professional norms.  And, importantly, as I've said before, the Supreme Court immediately - - after they - - after they finished that sentence, they said prevailing norms of practice as reflected in the American Bar Association Standards are what they're talking about; okay?

Mr. Hanlon then stated the following when asked if there were any "ABA Defense Function Standards" particularly applicable to this case:

> There are.  And, let's start with the really important ones in this case, at least in my view; okay?  So, Standard 4-4.1 is called the duty to investigate and engage investigators.  Defense counsel has a duty to investigate in all cases and to determine whether there is a sufficient factual basis for criminal charges.  The duty to investigate is not terminated by such factors as the apparent force of the prosecution's evidence, a client's admissions of act suggesting guilt.
>
> Now, I know from my reading of the record in this case that the prosecution believes it has a have [sic] strong case here on guilt;

---

[2]We note that Defendant's Exhibit 7-6 does not indicate the date range for the report. Another witness testified, however, that Exhibits 7-4 and 7-6 included the cases for the timeframe that Mr. Shelton represented Defendant.

okay?  It's very important to note that that does not terminate the duty to investigate.

Regardless of the strength of the State's case, Mr. Hanlon testified, Defendant "is entitled to have his lawyer subject the State's case to the crucible of meaningful adversarial testimony." As for Mr. Shelton's actions in Defendant's case, Mr. Hanlon testified:

> Counsel should have met with Mr. Queen at the earliest possible moment to establish an effective attorney/client relationship. There is simply no evidence in this case that he did that.  I believe it's months, if I am not mistaken, from the record of visits, it shows months.  He is sitting in jail, okay, and he's not seeing a lawyer, his lawyer, for 60 days. . . . Counsel should have attempted to interview the State's witnesses, okay, including the store employees, the police officers. He should have visited the scene of the alleged crime.

Later in his testimony, Mr. Hanlon stated there appeared to be gaps in the visitation record of "like 500 days" where Defendant is sitting in jail without any visit by his attorney.  Although Mr. Hanlon acknowledged that Defendant's case was primarily a "mitigation case," Defendant's counsel was still obligated to provide "meaningful adversarial testing" of the State's case.  According to Mr. Hanlon, he read emails from Harry Fontenot, the District Defender, indicating Mr. Shelton's "lack of diligence and promptness and punctuality in meeting with Mr. Queen[.]"

According to Mr. Hanlon, Mr. Shelton's file contained no evidence of any investigation of Defendant's case.  In Mr. Hanlon's opinion, "there was always a significant risk that the representation of one or more of Mr. Shelton's clients was materially limited by his responsibilities to all of his clients, particularly Mr. Queen[.]"

In reviewing Defendant's case, Mr. Hanlon considered the standard for an appropriate workload and the standard for diligence, promptness, and punctuality. According to Mr. Hanlon, there appeared to be gaps of 500 days or more between

Mr. Shelton's visits to Defendant, indicating a serious problem. From reading Mr. Fontenot's emails, Mr. Hanlon opined that Mr. Shelton's visits with Defendant appeared to be prompted by an email from Mr. Fontenot. As for the standards of maintaining an effective client relationship and communication, Mr. Hanlon testified that the only time Mr. Shelton communicated with his client was when trial was approaching or when he got an email from Mr. Fontenot.

The next standard, interviewing the client, was likewise unmet, according to Mr. Hanlon. When asked if Mr. Shelton's file contained notes of jail visits, Mr. Hanlon replied, "Nothing." According to Mr. Hanlon, the file contained no handwritten notes or memoranda. The following colloquy then took place:

> A.   Standard 4-3.7, prompt and thorough actions to protect the client. Defense counsel should inform the client of his or her rights in the criminal process at the earliest opportunity. One of the big problems in this case is that Mr. Queen wanted this day that we're finally having right now before his case went to trial, and he communicated that repeatedly to his counsel; okay? You have too many cases; okay? You're not doing anything on my case. You need to raise this on a *Peart* motion; okay? And, lo and behold, you know, after this case is concluded, it comes to Louisiana Project Report and shows that there is some pretty - -
>
> . . . .
>
> A.   Sorry. I'm sorry, Your Honor. I'm sorry. This case goes to trial, I think, in December of '16, could be November.
>
> Q.   October.
>
> . . . .
>
> A.   And, then the report comes out in February. So, Postlelthwaite & Netterville agreed with this constant claim, and the American Bar Association, okay, and ultimately the Chief Justice of [the] Louisiana Supreme Court. They all agreed with Mr. Queen that this whole office and all Louisiana Public Defenders, you know, their conclusion is eventually they have five times as much work as this can - - I'll restate that. They have five times - - their workload is five times what it should be in order to provide reasonably effective assistance of counsel pursuant to prevailing professional norms.

Addressing more standards, Mr. Hanlon testified that Mr. Shelton had a duty to investigate the "show-up" line-up that took place in this case. When asked if he was aware of a motion to suppress the line-up in this case, Mr. Hanlon replied, "No. And, as Mr. Bergeron testified on cross-examination yesterday, unfortunately, I think that was his word, was Motions to Suppress are not filed very often here." Additionally, Mr. Hanlon testified that Mr. Shelton did not seek to interview all witnesses and failed to retain an expert witness to testify as to mitigating evidence for sentencing. Although a psychiatrist testified at a previous competency hearing as to what records would be needed to give an opinion about Defendant's "lack of memory issue[,]" Mr. Shelton failed to secure any such evidence.

Regarding the standard labeled "preparation for court proceedings," Mr. Hanlon testified that Mr. Shelton had a duty to inform Defendant and the court about the limits of his knowledge and preparation. Furthermore, Mr. Hanlon asserted, Mr. Shelton had a duty to inform the court that Defendant believed his lack of preparation was because of his excessive caseload. Mr. Hanlon further asserted that "flat-fee contracts" have been condemned by the American Bar Association because "they incent [sic] people to do the wrong thing, to put less work in on the case than the case deserves so that you can make a living and et cetera . . . ."

An example of Mr. Shelton's failure to advocate for Defendant, Mr. Hanlon testified that a prosecutor accompanied Mr. Shelton to visit Defendant in jail and tried to convince Defendant to take a plea. Mr. Hanlon testified that he blamed the defense lawyer, not the prosecutor.

21

The next standard Mr. Hanlon was asked to look at was from the Louisiana Rules of Professional Conduct, Rule 1.7(a)(2): "a lawyer shall not represent a client if the representation involves a current conflict of interest." "Conflict of interest," Mr. Hanlon testified, is defined as "the representation of one or more of the clients will be materially limited by the lawyer's responsibilities to another client." When asked how that rule applied to Defendant's case, Mr. Hanlon testified, "Mr. Shelton had obligations to other clients that interfered with his work here on behalf of Mr. Queen, and that appears to me to be overwhelmingly true from the record that we have been able to assemble."

The following colloquy concluded defense counsel's questioning of Mr. Hanlon:

> Q.    So, in terms of the Louisiana Rules of Professional Conduct, was there in your opinion a significant risk on the day of trial that Robert Shelton's representation of Mr. Queen would be materially limited by Mr. Shelton's responsibilities to all of his other clients?
>
> A.    There was, and the risk was significant in this case. It's not our burden, but it was significant, the likelihood that that would occur.
>
>     . . . .
>
> A.    I would say you could probably say to a moral certainty it was going to happen.

On cross-examination, the State asked Mr. Hanlon if it was possible for a lawyer with too many cases one year, to later regain his effectiveness if his caseload decreased the next year. Mr. Hanlon responded, "As a theoretical matter that could happen. It doesn't happen in public defense, but in America." The following colloquy ensued:

> Q.    Well, I want to draw your attention, and I'm going to reference Defense Exhibit 7-7 which says that in October of '13 Mr. Shelton had 143 open cases, in January of '14, 142. In January of '15 he had 53 open cases. In January of '16 he had 31 open cases, and that's ten

22

months before trial.  By the time we come to trial he had - - and, we went through it, and I apologize to the Court, but painstaking detail yesterday, 9 individual clients, 6 that are LWOP and they have attached to it 16 lesser felonies.  So it's fair to say that over the course of time Mr. Shelton's caseload reduced dramatically.

A.      So, I would say - - and I've seen that exhibit.  Do you want to show that to me or can I look at that?

        . . . .

A.      So in response to your question, it is apparent that his work under a flat-fee contract with the Public Defender, okay, in conflict cases is coming down over time.  He's also aging at this point.  He's also carrying, looks like, a pretty significant civil caseload.

Q.      Well, you were here yesterday when the testimony was they, in fact, changed his contract from being general conflict to being LWOP primary, and that's why it dropped from 142 down to 53.

A.      Yeah.

Q.      And, you talked about his civil caseload. You were shown that, I assume, by Ms. Blouin and Mr. Bergeron. Those were primarily succession cases that were all minor successions, most of which a Judgment of Possession was entered the same day as the Petition.

A.      Yeah.  So, I agree with that, and there were others, okay, and, we don't know the extent of it.  But, whatever it was in total it was too much for him to handle at that time because he wasn't - - as Mr. Bergeron testified, there is no motion practice here. There is nothing in these files; okay?

When the State asked Mr. Hanlon if the defense attorney, rather than the

client, usually makes a claim of excessive caseload, Mr. Hanlon replied:

A.      Mr. Queen was intelligent enough to figure out a claim that he thought his lawyer should bring; okay? And, that claim was eventually validated by the Chief Justice of the Louisiana Supreme Court, Postlethwaite & Netterville, American Bar Association, two Judges who were former prosecutors on the Court of Appeals. He's as [sic] pretty smart guy to figure that out. Most clients, to answer your question, don't say that.

Q.      Just so we're clear, those individuals did not say Robert Shelton was ineffective because of a heavy caseload. They said the Louisiana Public Defender's System as a whole had too many cases.

23

A. Yeah, and that's what he's saying, too.

Mr. Hanlon agreed that Mr. Shelton told the trial court that Defendant was being diligently represented and that he had no objection to the dismissal of the last *Peart* motion filed by Defendant. Mr. Hanlon asserted, however, that Mr. Shelton committed a serious violation of the "rules of professional responsibility" when he "denigrate[d]" his client's claim in front of the court. The State introduced Mr. Shelton's entire file for Defendant. When asked if there was evidence in Mr. Shelton's file that investigators worked on Defendant's case, Mr. Hanlon stated that Defendant's family hired an investigator. Mr. Hanlon also agreed that there were dozens of letters between Mr. Shelton and Defendant. Although Mr. Hanlon agreed there was communication between Mr. Shelton and Defendant, he said it did not approach the amount required for reasonably effective assistance of counsel.

When the State asked Mr. Hanlon if he knew the prosecutor attended a meeting with Mr. Shelton and Defendant at Defendant's request, Mr. Hanlon thought he might have seen that in the file. Mr. Hanlon claimed, however, that this did not mitigate the problem of Mr. Shelton "putting a prosecutor in touch with his client."

As for Mr. Hanlon's testimony that Mr. Shelton's caseload was excessive, the following colloquy took place:

> Q. You talked about - - several times about the - - having too much work, too much caseload, and I believe it's your opinion that because of his caseload these failings occurred; is that right?
>
> A. It is.
>
> . . . .

24

Q.     They're up there already, okay, good. When you and Defense counsel were walking through the number of hours and the caseloads several times it was suggested that this was his caseload between October of 2013 and December of 2016.

A.     Um-hum.

Q.     And, that you had calculated all of your math on a 2,080-hour work year and three years of time.  Defense Exhibit 7-4, however, has many cases on it that Mr. Shelton began work on as early as 2011.

A.     I saw that.

Q.     And, some that he worked on through 2017 until he, unfortunately, passed.

A.     Um-hum.

Q.     So, it really wasn't a question of three years so much as it was a question of six and a half years.

A.     I'm probably the wrong witness to testify on that. I think you'd have to - - those documents were not - - they were generated by Mr. Bergeron and - -

Q.     But, you met with Mr. Bergeron and you testified from them on direct. You testified that that list of cases totaled up to 7,791.86 hours. And, if we take that number and divide it by 2,080 would be 3.74 years of work, and you called that caseload - - I believe the term you used was grossly excessive.

A.     Right.

Q.     Except it wasn't over three years.  It was over six and a half.

A.     I think the vast majority of it was over three years, and I think - -

When the State suggested that dividing the total of cases by six and one-half

years would be about "1,200 hours over the course of a year[,]" defense counsel

objected, and the following colloquy ensued:

MS. FARIA [Defense counsel]:

He stated that he is not the right witness to do this. We have such a witness. And so, pursuit of this line where we have a witness

25

who is an expert who is saying I don't have that expertise to do that, we have another witness who does have that expertise.

. . . .

MR. PIPES [the State]:

If he doesn't have the expertise to do that, they shouldn't have asked him about it on direct, Judge. A substantial portion of this witness' testimony was based on the fact that his workload was excessively huge, and that was based, he testified, on Defense 7-4 and Defense 7-6. The problem is their calculations on Defense 7-6 are inaccurate, and that, I believe, undercuts his opinion.

. . . .

MS. FARIA:

Your Honor, we simply - - we understand that there are some periods of time that work was done when a case was assigned prior to the - - what I continue to call the relevant time period, and we understand that. But, even assuming that there are several cases where only some of the work was done during the relevant time period, the way that we use these hours, because we have repeatedly said the purpose of this work is for budget, that this is the manner in which we have to look at his workload.

And so, from our perspective there may be some fine gradations of removing some of these hours, but the relevant time period is what was open and worked on, and we cannot tell because you can't tell from something like this where the bulk of the work was. We don't know. We don't know that.

So, we - - using a budgetary method, we look at this and the laws of big numbers. That's what we do for the purpose of budget. We don't know these individual cases because we're not here about those other cases. We're here about Mr. Queen's case.

The trial court overruled defense counsel's objection to the State's question.

### Lindsay Blouin

Lindsay Blouin, an attorney from Baton Rouge who was accepted as an expert in "administration, supervision and delivery of public defender services in Louisiana in accordance with Trial Court Performance Standards as codified in the Louisiana Administrative Code," testified that the ideal timeframe for a defender to

meet with an incarcerated client was within 72 hours of being assigned the case. When Ms. Blouin reviewed the jail logs from 2014 to 2016, she discovered that Mr. Shelton took an average of 164.2 days to first visit a defendant in jail. In some cases, Ms. Blouin testified, Mr. Shelton took almost a year to make his first jail visit. Ms. Blouin also testified regarding emails sent by Harry Fontenot to Mr. Shelton regarding Mr. Shelton's failure to visit clients in jail.

According to Ms. Blouin, Mr. Shelton took 103 days to first visit Defendant. Mr. Shelton then visited Defendant four times in four months followed by a 538-day gap before the next jail visit. During that gap period, Ms. Blouin testified Mr. Shelton visited other clients in jail. Mr. Shelton then visited Defendant once in June of 2016, before visiting Defendant with the prosecutor on October 13, 2016. When asked how an attorney's caseload affected his ability to make timely jail visits, Ms. Blouin replied, "It makes it incredibly difficult." As for the difficulty caused to Mr. Shelton, Ms. Blouin testified:

> We see Robert Shelton going out to the jail to visit almost every client he is assigned to during the duration of his representation of Timothy Queen. There are a few cases where the logs don't record that he saw that individual client. But, the majority of the clients he was assigned, he was endeavoring to get out to see. He was being assigned so many clients though that that's where you see this average visitation date between assignment and first visit is 164.2 days. So, you're seeing the effort. You're also seeing the overwhelm.

Ms. Blouin testified that she saw a correlation between Mr. Shelton's jail visits and emails from

Harry Fontenot regarding his lack of jail visits. According to Ms. Blouin, one of the problems of an overloaded public defender is he is always putting out the biggest fire at the moment.

27

Ms. Blouin testified that she saw no indication that Mr. Shelton performed an initial interview with Defendant. Ms. Blouin also saw no indication that Mr. Shelton went to the crime scene, interviewed experts, interviewed witnesses, obtained discovery, or reviewed discovery. Additionally, Ms. Blouin did not see any pre-trial motions filed by Mr. Shelton on behalf of Defendant. In Ms. Blouin's opinion, there were good faith grounds to litigate the admissibility of the "show-up" lineup used in Defendant's case. According to Ms. Blouin, Mr. Shelton was obligated to provide effective representation even as Defendant's hybrid counsel.

When asked if there was an issue in Defendant's case with the deadline for asserting an affirmative defense, Ms. Blouin believed Defendant was denied the ability to put on information about intoxication. Mr. Shelton's failure to visit Defendant in jail, Ms. Blouin testified, could have hindered the defense's ability to discuss possible defenses and the information needed to rebut any allegations at trial.

Turning to Defendant's Exhibits 7-4 and 7-6, the following colloquy ensued:

Q. Thank you. Now, I think earlier during Mr. Hanlon's testimony Mr. Pipes pointed out that Mr. Bergeron's spreadsheet included some cases that were assigned prior to his assignment of Mr. Queen's case.

A. Yes.

Q. Why should those cases not be excluded from the computation of hours?

A. Because the cases were open cases being worked by Mr. Shelton during the timeframe in which he represented Timothy Queen, and that's also backed up by the jail logs. You don't get the case assigned and work it for 24 hours and then it's done and over with. As we've just now gone through the entirety of the Louisiana Administrative Code's Trial Practice Standards, there's a lot of work to be done as a lawyer representing a client exposed to deprivation of liberty.

And so, Mr. Hubert Antoine, for example, was a case that Mr. Shelton was assigned prior to being assigned Timothy Queen, but it was a case that he was working during his representation of Timothy Queen. And so, if we need to answer the question of was this lawyer overloaded, it's where is his time having to be spent? So, even if Hubert Antoine was assigned before he was assigned Timothy Queen, Hubert Antoine was a demand on Robert Shelton's time at the same time that Timothy Queen was a demand on his time.

. . . .

Q.    And, I think, with respect to these numbers and the hours that you talked about there was a suggestion that this caseload, as created by Mr. Bergeron of Robert Shelton's from October 2nd of 2013 to December 31st of 2016, that those cases should have actually been over a period of six and a half years when you wrote down the hours because a couple of them were assigned in 2011.

A.    Um-hum.

Q.    Do you see any problem with that argument?

A.    So, to go back to Exhibit D 7-4, which is Robert Shelton's caseload from October 2nd, 2013 to December 31st, 2016, as created by Mr. Bergeron, these are all of the cases that Mr. Shelton was working during the time of his work with Mr. Queen. And so, they do not include all of the cases that Mr. Shelton might have worked in 2011 or all of the cases that Mr. Shelton worked in 2012. This caseload spreadsheet is exclusively the cases that were being worked by Mr. Shelton during the duration of the time he was representing Mr. Queen.

And so, this isn't every case that was demanding his time in 2011. This isn't every case that was demanding his time in 2012. This isn't every case that was demanding his time in 2017. This looks just at the duration of his representation of Timothy Queen and the other clients that were demanding his time during that period.

So, the number of cases would be considerably higher if we looked at every case that he worked in 2011 and every case that he worked in 2012, and every case that he worked in 2017. If you look at just the cases that he had in DefenderData in 2011, it's over 150 cases.

Ms. Blouin testified that only three 2011 docket numbers are included on

Defendant's Exhibit 7-4. According to Ms. Blouin, cases closed before Mr.

Shelton was assigned Defendant's case were not included on Exhibit 7-4; thus, not

all of Mr. Shelton's 2011 and 2012 cases are included. The following colloquy ensued:

> Q. And so, if you took the spreadsheet you created in D 7-6 and that hourly total, if you were to add those cases in 2011 and compute it over the six and a half years that Mr. Pipes suggested, is that going to add cases to that hourly total?

> A. That would add a significant number of hours. Again, in 2011 he had 154 cases. So, that would be significantly a higher number of hours than you see here. This hour total that's reflected in Exhibit D 7-6 is off of the cases that were worked during the time that Mr. Shelton was working Timothy Queen's cases.

When asked to give her expert opinion as to Mr. Shelton's ability to effectively represent Defendant, Ms. Blouin replied:

> In looking at the materials that I reviewed, and I'll really emphasize the jail logs specifically, Mr. Shelton had too many clients to give them the level of representation that, if we're looking at Mr. Queen specifically, he needed to receive effective representation of counsel. He's going out. He's meeting with clients. But, the best he can give them is on average 164 days later getting out to finally see them at the jail, and that's just not effective.

On cross-examination, Ms. Blouin agreed that the visitation logs she reviewed were from 2014 to 2016. Ms. Blouin also agreed that Mr. Shelton was assigned Defendant's case in October 2013. The following colloquy ensued:

> Q. So, if as soon as possible following the case Mr. Shelton wanted to meet with his client, that wouldn't be in the logs you reviewed.

> A. I would need to go back and review the first date of the logs, but I believe that they started in 2014.

Ms. Blouin agreed with the State that the records she reviewed would not show the meetings Mr. Shelton had with Defendant at the courthouse prior to hearings. Ms. Blouin testified, however, that meetings at the courthouse did not replace the need for confidential visits at the jail. The following colloquy ensued:

Q.    Now, you said he meets with his other clients; he is not meeting with Mr. Queen, and you attribute that to having a heavy workload. Isn't that also attributable to him simply not liking Mr. Queen and wanting to have to deal with him?

A.    Unfortunately, we are not able to ask Mr. Shelton whether that had any bearing on it.  However, we do see that Mr. Shelton does take a considerable amount of time more often than not to get out for his first jail visit to meet with a client when we are looking at those logs and the clients he was representing during the time he represented Mr. Queen.

One of the other things that we see is that in some instances he is only able to get out to meet with a client once during the entire life of their case.  So, Mr. Shelton is handling very, very serious files during the time he represents Mr. Queen; right?  All of these individuals in jail are charged with something where they are facing serious deprivation of liberty. All of them are important.  He is having to triage who he is seeing.

And so, when we have someone who has an on average from date of assignment to first jail visit of 164.2 days, that is someone who is overwhelmed.  If your position was, well, maybe he just didn't care, well, then why would he be going to see anyone?  He is getting out to see almost every single person he is assigned. It is taking him incredibly long periods of time to get out the first time, and incredibly long periods of time more often than not to get out the second or the third time. And, that is one of the best indicators you can see someone is trying.  They need fewer cases. They are overwhelmed.

Q.    But, again, that's speculation on your part, based on what you're seeing. It equally fits he may not care about Mr. Queen.

A.    Again, we are in a position that we cannot ask Mr. Shelton that question.  I certainly can't.

Ms. Blouin agreed that typically, armed robbery cases should take a little under seventy hours.  When asked if her position was that Mr. Shelton's cases that closed a year before trial made it impossible for Mr. Shelton to handle an armed robbery that takes "70 hours, two weeks[,]" Ms. Blouin responded, in part: "[Y]es, cases that were closed before Mr. Queen's case goes to trial, because he had representational obligations to those clients at the same time that he had an

31

obligation to Mr. Queen impacted where he was spending his time, impacted his ability to be prepared for trial."

When the State noted that Mr. Shelton's file contained plans to cross-examine witnesses and other evidence that Mr. Shelton was preparing for trial, Ms. Blouin responded:

> And, that's why you don't hear me say there was nothing in the file that would indicate that Mr. Shelton knew anything about who Tim Queen was. This is an individual who you can see from the file believed he had a representational obligation to this individual, believed he was his attorney, and is preparing. The question is, with the overwhelming workload that he had, and the lack of resources that he had as this sort of lone individual on behalf of Mr. Queen at this point, could he provide him effective representation.

When questioned by the State about the chart showing the amount of time budgeted to Mr. Shelton's assigned cases, Ms. Blouin agreed that she budgeted 200 hours for a case on which Mr. Shelton was counsel for only the first 60 days prior to billing. Ms. Blouin offered the following explanation:

> A. And, the reason for that is because that was a case that he was working during the time that he represented Mr. Queen. That was not the total workload that Mr. Shelton was suffering under in 2011, in 2012, and then after Mr. Queen's case in 2017. This caseload summary chart that then was used to create Exhibit D 7-6 was so that we could ensure that this Court understood what sort of the floor was, the unimpeachable floor. We know at a minimum - - at a minimum this was what he was working on because this was what Mr. Bergeron could cross-reference.

> Q. But, again, you tagged him for 200 hours for Levy Edison.

> A. Yes.

> Q. And, he had neither an obligation nor the need to put 200 hours into Levy Edison under those standards.

> A. You could take the whole Mr. Levy case out and it would still be 7,591.86 hours.

> Q. And, if you take out all of the cases that he was working in 2017 after this case went to trial and was sentenced out and, if you

take out the hours that he spent working on the cases prior to being assigned this case out, and you look at it, the fact is that chart is not accurate.

A.    I would disagree with that assessment.

. . . .

A.    Mr. Shelton represented Timothy Queen between October of 2013 and December of 2016. All of the cases that he was working during that time were demands on his time, and we know that when we're looking at whether or not a public defender was overloaded to the point that they were likely at risk of rendering ineffective assistance of counsel, you must look at the demands on their time.

. . . .

A.    If you want to divide the math that was put in this chart across a greater range of time, then the range in which Mr. Shelton represented Timothy Queen you are going to sweep in the additional cases that were also demands on Mr. Shelton's time. So, if we talk about cases that maybe got closed before Mr. Queen was appointed to Mr. Shelton but you're saying this - - this number needs to be divided across that entire six - - I think you said six and a half years - - entire six and a half year range, then you have to include all the other cases, and this is going to increase this number.

So, the reason why exhibit D 7-6 is accurate is because it is looking at the cases through this three-year period, this October 2013 to December 2016 range.  But, if you want to talk about the entire six and a half years, we're going to have to talk about all of those other cases like the 154 cases from 2011.

Q.    But, he was not working all of those cases from start to finish in those three years; was he?

A.    So, while he was not, that's why Mr. Hanlon told you in his testimony that this was not saying that every single high felony case is only going to take 69.79 hours. This is an hourly standard for budgeting purposes so that public defender supervisors can know whether or not they need to bring in additional lawyers or can know whether or not they need to refuse appointments.

Q.    But, your chart budgets him for work he did not perform in this time period or had to perform in this time period.

A.    Because it's not about the - - you continue to use the hourly standard like that's going to be 69.79 hours for every single high felony.  It is a budget in the same way that in any household when you

33

sit down at the beginning of the year and you decide what you're budgeting for the year, that isn't necessarily all the money that you might spend. It is a budget though. It is a with [sic] this lawyer what is his time likely being budgeted out as. Is this a risk of potentially overloading a lawyer such that they will be ineffective because you then look, if you're making a determination if they are, in fact, ineffective in a case, at what did or did not happen, but this is simply a budget.

### *Jacob Johnson*

Jacob Johnson, the prosecutor who handled Defendant's case at trial in October 2016, testified that even as Defendant's hybrid counsel, Mr. Shelton persistently asked Mr. Johnson for a better plea deal for Defendant. Mr. Johnson testified that in his experience of litigating numerous cases against Mr. Shelton, if Mr. Shelton needed a continuance, he would seek it early and adamantly. By the same token, Mr. Johnson testified that Mr. Shelton did not ask for continuances "just because."

According to Mr. Johnson, he frequently saw Mr. Shelton meeting with Defendant in the holding area at the courthouse. As for the meeting he had with Mr. Shelton and Defendant at the jail, Mr. Johnson testified that he was informed by Mr. Shelton that Defendant wanted to meet with Mr. Johnson and Carla Sigler, the Chief of the Calcasieu District Attorney Appeals Division. Defendant wanted the meeting, Mr. Johnson explained, to discuss a plea settlement. When asked about the relationship between Mr. Shelton and Defendant, Mr. Johnson testified that Defendant drove his representation. Mr. Johnson further testified:

> You would constantly see Mr. Shelton trying to explain things to Mr. Queen, Mr. Queen blowing him off. Mr. Shelton had a tremendous amount of patience from what I could tell by watching them interact. But, I think it's absolutely abundantly fair to say that Mr. Queen was extremely rude to Mr. Shelton non-stop in all of the dealings I saw between them.

According to Mr. Johnson, Ms. Sigler explained to Defendant what the evidence would show: "[T]hese ladies [were] going to . . . identify [him] as the person that put a gun in their face and threatened to kill them . . . ." Defendant stated that he knew what the evidence would show but explained that his strategy was going to be to "attack what he labeled as Judge Bradberry's impulsive decisions on some of his motions." Defendant also touted "intoxication" as a defense, which Mr. Johnson stated did not make much sense for a general intent crime.

Mr. Johnson stated the following about Defendant's complaint that Mr. Shelton did not use an investigator hired by Defendant's father:

> Mr. Queen had this conspiracy theory that his dad's gun that was recovered in a dumpster thrown there by Mr. Queen shortly after the robbery was replaced by the police with a different gun. That, of course, never happened. But, that was one of the things that he wanted his investigator to look at. He was unhappy with the speed with which Mr. Shelton went and looked at the gun.
>
> There was no reason for Mr. Shelton to believe there was any validity to that. There was, of course, no validity to that. And, there was nothing found as far as DNA or fingerprints that needed to be rebutted. In other words, I didn't have his fingerprints on the gun, so he didn't have need for a fingerprint expert. I didn't have his DNA on the gun, so he didn't have need for or desire any reason to have somebody hired for DNA to say, well, I don't know about their process here or something to that effect.

Mr. Johnson also testified about a recorded jail call in which Defendant refused his family's offer to hire private counsel because it would mess up his "public defender strategy." According to Mr. Johnson, it was clear "that nothing about Mr. Queen's strategy had to deal with his guilt or the evidence of his guilt or anything else." In fact, Mr. Johnson testified Defendant took steps to be solely represented by Mr. Shelton only after this court's pre-trial decision denying Defendant's first *Peart* motion because of Mr. Shelton's hybrid representation.

Mr. Johnson explained that he opposed Defendant's motion to do away with the hybrid representation: "It was my position that it was nothing more than Timothy Queen gaming the system again as he had for nearly a decade at that point." The following colloquy took place regarding Defendant's re-urging the *Peart* motion after he became solely represented by Mr. Shelton:

> Q.    And, ultimately, Mr. Queen, once Mr. Shelton was named his attorney, again filed for a *Peart* hearing.
>
> A.    That's correct.
>
> Q.    And, that was summarily denied prior to trial?
>
> A.    It was. I had a conversation with Mr. Shelton when that occurred and I rolled my eyes at Queen for making the offering again. We were about to start evidence. And, I said, Robert, you have fewer cases than anybody. How many cases do you have anyway? And, his response was, quote, "very few."

When asked how he helped alleviate some of the caseload of the Public Defender's Office, Mr. Johnson replied:

> I think it's all about communication, you know. Ms. Edmondson and I were in the same division, Judge Bradberry's division, for a number of years. As she was the division defender and I was of the division prosecutor, we went from the second largest division at the 14th, which had seven criminal divisions there at one time to getting to the smallest division, smallest caseload. And, I think that was only over about a year, year and a half that it took to get us there.

Finally, when asked if Mr. Shelton ever gave any indication of being overworked or unprepared, Mr. Johnson answered:

> No. I mean, you'll see, I think it was in October of '15 or sometime in the Fall of 2015 Mr. Shelton filed a Motion for Speedy Trial, indicating that he was ready to try the case. At that time he had it for quite some time. I'm not saying he didn't have a job to do, but it was a straightforward case. I was able to prepare to try it in a very small amount of time, as a relatively new prosecutor with about 600 other files on my docket. It was a pretty straightforward deal. But, no, I would say that the *Peart* motion that we're here on now that Mr. Shelton said in response to my question how much cases do you have

36

anyway, very few. That is this motion that we're dealing with right now.

On cross-examination, defense counsel asked Mr. Johnson if Mr. Shelton ever relayed any mitigating factors in favor of Defendant. According to Mr. Johnson, Mr. Shelton thought that Defendant may have acted out of character because he was intoxicated. The problem with that theory, Mr. Johnson testified, was that Defendant had been convicted of robbery several times, the first one being in 1984.

Defense counsel also pointed out that one of the doctors who testified at Defendant's competency hearing testified that Defendant may have suffered from "a cocaine-induced psychosis[.]" When asked if he felt Mr. Shelton should have investigated "a possible not guilty by reason of insanity" based on the doctor's testimony, Mr. Johnson testified that he believed the theory was investigated by Dr. Anderson. Although Dr. Anderson's examination of Defendant took place during a previous lawyer's representation, Mr. Johnson stated that Mr. Shelton would have had access to Dr. Anderson's findings. If defense counsel was suggesting that Mr. Shelton should have gotten another doctor to examine Defendant, Mr. Johnson replied:

> A.    It would depend.   The issue is that you've got, uh - - we had no evidence ever that Mr. Queen was actually insane, none.  A doctor's - -
>
> Q.    You mean you had no evidence that there was none that was available, because I wonder if any doctor who was a neurologist was ever engaged to examine Mr. Queen to determine if he either had brain damage or if he was suffering from a cocaine-induced psychosis.
>
> A.    I don't know. All I can tell you is that Mr. Queen would always speak or have been caught previously speaking fluently about the evidence and about the facts of the case, which would certainly lead to [sic] me to believe that he was not under psychosis.

37

## *Analysis*

Based on our review of the evidence, the trial court did not err in finding that Mr. Shelton was not overburdened or lacked resources such that he could not provide an adequate defense of Defendant. While defense experts testified to a lot of generalizations including a "significant risk" that Mr. Shelton was overburdened, the facts of Mr. Shelton's caseload prove otherwise. Moreover, a "serious caseload" is not equivalent to an overly burdensome one. Further, concluding that "all Louisiana public defenders" have five times as much work as they should simply does not address the specific facts of this case. Mr. Shelton was not a public defender but a conflict contract attorney. The actual number of cases that Mr. Shelton had during the period chosen by the trial court, which was generous to Defendant since he had hybrid representation until the day before trial, was only 34 cases, far below the suggested maximums under ABA standards. Many of the cases used by the defense experts in their calculations pre-dated Mr. Shelton's representation of Defendant and concluded early in Mr. Shelton's representation of Defendant during the period the trial court did not consider in its *Peart* analysis. Including these cases that Mr. Shelton was no longer working on in 2016 is an inaccurate representation of his case load and attributes an unknown amount of work hours that pre-dated Mr. Shelton's representation of Defendant.

Admittedly, Mr. Shelton did not visit Defendant in jail as much as one would have liked. However, the particular fact of this case are that four attorneys pre-dated Mr. Shelton who would have completed many of the preliminary investigations and interviews in Defendant's case that Mr. Shelton is faulted with failing to do. Written communication with Defendant was preferred by Mr.

Shelton because Defendant was difficult and there were dozens of letters in Mr. Shelton's file.

The defense expert's exhibits were based on theoretical budget models of attorney work hours that did not align with Mr. Shelton's actual work on his caseload. Moreover, Mr. Shelton himself told the prosecutor that he had "very few" cases. It was clear that Mr. Shelton did not feel ill-prepared to go to trial as he so stated and that position under the circumstances of this particular case did not present a conflict of interest with his client.

The trial court was within its discretion to find the State's questioning more persuasive relating to Mr. Shelton's actual caseload. Mr. Shelton's 2016 caseload had been significantly reduced as of January 1, 2016 from 143 cases in January 2014, to 34 cases by January 1, 2016. Mr. Shelton obviously felt more than prepared to take the case to trial as evidenced by his earlier motion for speedy trial and the testimony of the prosecutor. Moreover, Mr. Shelton's decision not to undertake certain courses of action were not due to his being overworked and ill-prepared but were due to other factors such as refusing to pursue baseless claims. For example, Mr. Shelton decided not to pursue an investigation into a made up conspiracy claim, to support Defendant's public defender strategy, and his ill-founded intoxication defense. While counsel does have a duty to his client, it does not extend to every baseless pursuit that client wishes to pursue. Moreover, it was clear from Defendant's own testimony, which we set forth in *Queen*, 237 So.3d 547*,* that the *Peart* review was part of Defendant's personal trial strategy as he declined his father's offer of private counsel in a jailhouse phone call because it would mess up his ineffective assistance of counsel strategy. Defendant's trial

strategy was to file a *Peart* motion rather than refute any of the claims in the State's case against him.

In reviewing the totality of the circumstances, we find no error in the trial court's denial of Defendant's *Peart* motion as it did not err in finding that Mr. Shelton's caseload was not overly burdensome nor his resources limited. This assignment of error is without merit.

**PRO SE ASSIGNMENT OF ERROR ONE**

Defendant asserts the trial court erred when it sustained the State's objection to portions of the testimonies of his former attorneys—Mr. Alexander, Mr. Bouquet, Mr. McHale, and Mr. Bergeron. Defendant also asserts the trial court erred in denying his motion to reconsider this ruling.

"It is well settled that a trial court's 'determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion.'" *State v. Clarks*, 24-640, p. 1 (La. 5/21/24), 385 So.3d 688 (quoting *State v. Mosby*, 595 So.2d 1135 (La.1992)).

### *Peart Hearing*

At the *Peart* hearing, defense counsel wished to question Defendant's PDO attorneys from 2009 through the beginning of Mr. Shelton's representation in 2013, arguing that such testimony would establish "historically from 2009 what we contend is inadequate resources, as well as heavy caseloads." The State objected and argued that that such information was irrelevant to the question of what resources Mr. Shelton had when he represented Defendant.

The State argued:

> Your Honor, the State would disagree with Mr. Boren's representations about what we're here for. The Third Circuit was very clear. It was whether the defendant's counsel, Robert Shelton, was

ineffective based on his excessive caseload and his inadequate resources. Robert Shelton wasn't part of the Public Defender's Office. He was a contract attorney. What happened with Mr. Alexander or any of the attorneys who followed during the hybrid representation is irrelevant because, as the Third Circuit pointed out in his direct appeal, because of the nature of his hybrid representation, he's not entitled to *Peart* relief.

We are here to focus on the time period where Mr. Shelton became his sole attorney, which was October 17 of 2016, and what was the status of Mr. Shelton's practice at that time. The rest of this is, frankly, irrelevant and has been addressed by the Third Circuit. And, if Defense had a problem with that, they should have sought writs. Writs were denied on his appeal.

The trial court sustained the State's objection and allowed the proffered testimony of Defendant's former attorneys with the PDO, ruling as follows:

One of the cases I recently reviewed with regard to this was *State vs. Covington*, Supreme Court case, 318 So. 3d 21. And, that case specifically indicated that to expand or to use other cases as a basis for an individual case was inappropriate, that it needed to be a case-by-case individualized analysis, which I would agree would have to be what Mr. Shelton's actions and resources were.

The fact that either Mr. Alexander or any other attorney utilized various resources or had them available is a distinct question as to what was available and what Mr. Shelton did.

### *Defendant's Motion to Reconsider*

On February 2, 2023, Defendant filed a motion for the trial court to reconsider its ruling that the proffered testimonies were not relevant. Defendant argued that "if the very first lawyer (and all four subsequent lawyers), all had caseloads that were violative of *Peart*, that is relevant to a determination that the Third Circuit wants this Court to address." Defendant further alleged that the State opened the door to the relevancy of testimony regarding Defendant's mental health and intoxication defenses. In response, the State again argued that such testimony was irrelevant and, further, since Defendant "took it upon himself to act as counsel, he waived any claims of ineffectiveness arising from that time period."

41

On April 24, 2023, the trial court issued a written ruling denying Defendant's motion to reconsider. The trial court ruled, in pertinent part:

> As a starting point, the Court notes that this case is on remand from the Third Circuit Court of Appeals for a very limited purpose: to conduct an evidentiary hearing addressing whether Mr. Shelton was ineffective due to caseload and/or inadequate resources at the time of Mr. Shelton's representation of Mr. Queen. The Court thus has a very narrow task – to apply the standards of Peart to Mr. Shelton's representation of Mr. Queen. This limited directive is the very reason the Court only allowed the subject testimony of Mr. Alexander, Mr. Bouquet, Mr. McHale, and Mr. Bergeron to be done via proffer. The workloads of attorneys other than Mr. Shelton were not included in the directive given by the Third Circuit Court of Appeal. Importantly, those witnesses were allowed to testify on the record of this matter, but when their testimony entered the realm of their representation of Mr. Queen, rather than Mr. Shelton's representation, the Court found that testimony to be irrelevant and allowed the defense to proffer same. The Court maintains its ruling that the subject testimony is irrelevant as it does not relate to the representation by Mr. Shelton. Further, considering said testimony would be expanding the scope of the directive given to the Court by the Third Circuit Court of Appeal, which is inappropriate.

In addition to arguments raised in his motion to reconsider, in his brief, Defendant disputes the State's claim that the only issue to be determined is Mr. Shelton's caseload on October 17, 2016 (the day before trial began). Defendant asserts this argument is defective "because while a hybrid representation situation may prevent a defendant from asserting . . . a *Peart* claim, it has no application in how an attorney's caseload is to be calculated, which is governed by professional standards and arrive at the numerical sum of all cases that are carried over; opened, or closed annually." Defendant claims that a "caseload cannot be determined to be excessive or not by simply examining what the attorney was handling on a particular day."

*Analysis*

As the trial court noted, the supreme court stated the following regarding the evidence relevant to a *Peart* analysis:

> This court previously ruled, in **State v. Peart**, that because there is no precise definition of reasonably effective assistance of counsel, any inquiry into the effectiveness of counsel must be individualized and fact-driven, which necessarily involves a detailed examination of the specific facts and circumstances of the case. **State v. Peart**, 621 So.2d at 788. See also **State v. Reeves**, 06-2419, pp. 66-67 (La. 5/5/09), 11 So.3d 1031, 1075. Although motions pertaining to alleged ineffective representation of multiple indigent defendants may be consolidated, in order to obtain evidence related to a counsel's workload if relevant to assessing the claims made, "the true inquiry is whether an individual defendant has been provided with reasonably effective assistance, and no general finding by the trial court regarding a given lawyer's handling of other cases, or workload generally, can answer that very specific question as to an individual defendant and the defense being furnished him." **State v. Peart**, 621 So.2d at 788. A determination of effectiveness of counsel requires that the trial court "examine each case individually," make "a particularized finding," and "issue an independent judgment regarding each defendant." **Id.**

*State v. Covington*, 20-447, p. 6 (La. 12/1/20), 318 So.3d 21, 25.

This court's remand instructions in *Queen*, 237 So.3d 547, offer additional guidance as to the evidence relevant to the *Peart* hearing: "At the evidentiary hearing, Defendant should be allowed to present evidence similar to the evidence presented in *Peart* and *Reeves* as to his counsel's caseload and resources *at the time he represented Defendant*." *Id.* at 584 (emphasis added). This court also held that it would "abide by [its] pre-trial decision" in which this court found Defendant was not entitled to relief under *Peart* while Mr. Shelton's representation was hybrid. *Queen*, 237 So.3d at 576. Accordingly, the trial court correctly found that the only relevant time period for its *Peart* analysis was the time period in which Mr. Shelton was Defendant's sole representative—the day before trial, October 17, 2016.

The proffered testimony relating to the PDO's caseloads was not limited in scope to the specific period at issue—the day before trial. Furthermore, this testimony was not clearly individualized to Mr. Shelton's representation of Defendant as contract counsel. As Mr. Bergeron stated in his admissible testimony, he had no supervisory role over Mr. Shelton. Mr. Bergeron explained that Mr. Shelton was an independent contractor responsible for using his "own professional skill and experience to represent the clients as best [he could] without [the PDO's] interference."

We agree with the trial court that the only issue at the *Peart* hearing was whether Mr. Shelton had sufficient resources and time to defend Defendant. The caseload and resources of Defendant's former public defenders is irrelevant. Defense counsel's arguments relating to trial strategies pertain to post-conviction ineffective assistance claims. Considering the above, the trial court did not abuse its discretion in finding the proffered testimonies were not admissible and in denying Defendant's motion to reconsider. Accordingly, this assignment lacks merit.

## PRO SE ASSIGNMENT OF ERROR TWO

Defendant contends the trial court erred in denying his post-hearing motion to supplement the record with an investigator's report. Defendant asserts that the investigator's report established a defense of involuntary intoxication.

On May 23, 2023, Defendant filed a "Motion to Supplement Record With Attached Report Regarding Involuntary Intoxication Defense." According to the motion: "The report is of an interview of a witness who was with Timothy Queen at the time surrounding the robbery for which Queen was convicted and says that Queen unknowingly was given a PCP-laced cigarette which basically causes a

person to 'go crazy' and induces psychosis." The motion stated that the report was not introduced at the hearing "because the Court's numerous rulings restricted testimony about resources and issues worked on by other counsel and the actual prejudice caused Queen by Shelton's ineffectiveness." Contending the report should be considered by the trial court in ruling on the *Peart* motion, the motion asserts:

> [T]his piece of evidence establishes that an investigator was engaged prior to Shelton's involvement, conducted an investigation supporting Queen's contention that he was involuntarily intoxicated, and that Robert Shelton had nothing to do with the report. This directly addresses points urged by the State in their pleadings. It establishes and corroborates the testimony both in open Court as well as the proffered testimony and is relevant particularly since it contradicts and disputes numerous allegations by the State that the "involuntary intoxication defense" was bogus and without support.

In its opposition to the motion to supplement, the State asserted that the motion was filed seven months after the submission of evidence for the *Peart* hearing, after both sides had submitted post-hearing memoranda. The State further asserted:

> The instant motion further sets forth that current counsel for Mr. Queen was in possession of both the document and the information it contained at the time of the hearing, but elected not to present it, citing to rulings by the Trial Court which "restricted testimony about resources and issues worked on by other counsel and the actual prejudice caused Queen by Shelton's ineffectiveness." It is not immediately apparent how the Court's prior orders limiting irrelevant presentations of public defender workloads would have barred the introduction of this document.
>
> Nevertheless, while the "work done by other counsel" was addressed by both sides, the document the Defendant now seeks to introduce is not independently relevant to the issue before the Court and is cumulative to the evidence already presented.
>
> That Queen's defense had access to investigators is already established and, to the knowledge of the undersigned, is not contested. Nor, for that matter is it contested that prior attorneys for Mr. Queen vetted the intoxication defense he insisted they raise.

45

The merit, or lack thereof, of the intoxication defense and Shelton's decision to abandon it may be relevant to a *Strickland v. Washington* analysis of the effective assistance Robert Shelton provided at trial, but is irrelevant to the question of whether Shelton's workload precluded him from providing an adequate defense pre-trial under *Peart*. That former claim, the propriety and prejudice of Robert Shelton's decisions at trial, has been reserved for subsequent post-conviction relief proceedings.

. . . .

It is unclear how the document suppressed by the Defendant until now helps his case that Robert Shelton was unable to provide an effective defense because of his caseload, but in light of the procedural and evidentiary issues set forth above, the State must object to this attempt to expand the record at this time.

On May 19, 2023, the trial court issued a written ruling denying Defendant's motion to supplement the record. Reiterating the limited directive from this court's remand for a *Peart* hearing, the trial court asserted that:

[t]he issue of whether or not to present a certain defense (in this case, the involuntary intoxication defense) goes more toward trial strategy of Mr. Shelton, and is more appropriately analyzed under *Strickland v. Washington*, 466 U.S. 668[, 104 S.Ct. 2052] (1984)."

Finding that trial strategy is not a consideration under *Peart*, the trial court held that "to consider same would improperly expand the directive of the Third Circuit." Thus, the trial court denied Defendant's motion to supplement.

In his brief, Defendant contends that the trial court erroneously ruled the issue involved trial strategy. Rather, Defendant claims the issue involves an example of Mr. Shelton's pre-trial deficient performance. Defendant cites a portion of the trial transcript wherein Mr. Shelton notified the trial court that he would be presenting an alibi defense of involuntary intoxication at trial. The State objected to the introduction of evidence pertaining to the intoxication defense since it had not been properly pled. Mr. Shelton argued that Defendant should be able to

46

present the defense "in the interest of justice." After taking the matter into consideration, the trial court denied Defendant the ability to assert the intoxication defense because of Defendant's failure to timely plead such defense.

Defendant asserts that even though Mr. Shelton's representation was hybrid, Mr. Shelton should have been aware that Defendant intended for him to take the lead at trial; thus, Mr. Shelton's failure to timely notify the State of the intoxication defense was "egregious pretrial deficient performance." Defendant cites a January 15, 2014, transcript where he told the trial court, in Mr. Shelton's presence, that Mr. Shelton would take the lead at trial. Even considering the trial court's determination that the relevant time period is limited to the day before trial, Defendant claims Mr. Shelton acted deficiently in failing to request a continuance in order to give timely notice of the intoxication defense. Defendant claims that "[a]ny pretrial act or omission that constitutes an example of deficient performance by appellant's counsel is a proper subject for examination aupt a *Peart* hearing."

*Analysis*

Defendant's argument that Mr. Shelton failed to file timely notice of the intoxication defense was not made in his motion to supplement but in a motion for new trial that is not before this court. Since this argument was not raised in Defendant's "Motion to Supplement Record With Attached Report Regarding Involuntary Intoxication Defense" (the motion before the trial court and now before this court), it is not properly before this court for review. La.Code Crim.P. art. 841.

As stated previously, the trial court's rulings on the admissibility of evidence is subject to an abuse of discretion. The motion to supplement simply alleged that an investigator was involved prior to Mr. Shelton's involvement in the case, and

47

Mr. Shelton did not follow up on the information. No allegation was made in the motion to supplement that Mr. Shelton's caseload caused his failure to look further into the investigator's report. Thus, the trial court did not err in finding the motion to supplement involved a claim of trial strategy rather than a *Peart* issue. Accordingly, the trial court did not abuse its discretion in denying the motion to supplement. This assignment lacks merit.

## DECREE

The trial court's denial of Defendant's second *Peart* motion is affirmed.

**AFFIRMED**.